DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellants, Kathleen P. and Eddie L., have each appealed from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their minor child, S.P., and placed her in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I {¶ 2} S.P., born on November 13, 2005, is the child of Kathleen P. ("Mother") and Eddie L. ("Father"). The parents are not married to each other. Mother is unmarried and Father is married to another woman.
 {¶ 3} When S.P. was born, CSB sought custody of the child directly from the hospital because of concerns with Mother's ability to safely care for the infant. Previously, Mother had *Page 2 
voluntarily surrendered her parental rights to two older children. Mother surrendered her parental rights to her first child, A.P., in 1999, following a conviction for child endangering based upon evidence that A.P. had been shaken and suffered permanent brain damage with resultant mental and physical handicaps. Mother's second child, D.P, was removed from her care in January 2004 due to concerns about Mother's mental health. D.P. was briefly returned to Mother's care under protective supervision in July 2005, but was removed again in September 2005 due to mental health issues, physical abuse, and a lack of parental supervision. In April 2006, Mother voluntarily surrendered her parental rights to D.P.
 {¶ 4} Given this history, on November 16, 2005, CSB filed a complaint in juvenile court, alleging that S.P. was a dependent child, and sought temporary custody of the child. The case proceeded to adjudication and disposition where the trial court found that S.P. was a dependent child and granted temporary custody to CSB. The agency placed the child in the care of a foster-to-adopt couple, the same couple that had previously adopted D.P., S.P's half-brother.
 {¶ 5} The trial court adopted a case plan which required Mother and Father to each: (1) successfully complete a parenting program and demonstrate what they learned in their interactions with the child; (2) complete a mental health assessment and follow all recommendations; (3) complete anger management classes; and (4) complete a drug and alcohol assessment and follow all recommendations, including random drug screens. Mother was additionally required to complete a parenting evaluation and continue to work with the Bair Foundation, a service provider that assisted with intensive home-based services. Father was additionally required to: (1) establish paternity, provide support, and establish a relationship with S.P. through visitation; (2) be a law-abiding citizen; and (3) pursuant to a July 2006 amendment, obtain and maintain clean, safe, stable, and independent housing with functioning utilities. *Page 3 
 {¶ 6} Kim Nelson was appointed to be the guardian ad litem for S.P. at the beginning of the case, but withdrew from that position on August 31, 2007. Linda Bennett was named to take her place on September 5, 2007. Ms. Bennett was charged with independently evaluating the case and reporting to the court.
 {¶ 7} The matter proceeded to hearing on CSB's motion for permanent custody, each parent's motion for legal custody, and Mother's motion for an extension of temporary custody. In September 2007, the trial court heard testimony for two days and then continued the hearing for one month due to the unavailability of two witnesses. When the hearing reconvened on October 26, 2007, guardian ad litem Bennett proposed consideration of Michael and LaQuella McNary (collectively, "the McNarys"), paternal relatives, as legal custodians. The McNarys only recently learned of the legal action regarding the custody of S.P. and wished to be considered as legal custodians. A continuance was granted in order to conduct a home study. Mother and Father each filed a motion for legal custody to the McNarys. Upon completion of the home study, Ms. Bennett presented her report and another day of testimony was taken. On December 12, 2007, the trial court issued its decision, granting permanent custody to CSB. Mother and Father have each appealed. Mother has assigned two errors for review and Father has assigned three errors for review. Because all of the assignments of error are related, they will be discussed together.
 II Mother's Assignment of Error Number One "THE TRIAL COURT ERRED IN ITS DECISION TO TERMINATE MOTHER'S PARENTAL RIGHTS AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 Mother's Assignment of Error Number Two *Page 4 "THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING MOTHER'S MOTION TO PLACE S.P. IN THE LEGAL CUSTODY OF RELATIVES AS THE DECISION WAS NOT IN S.P.'S BEST INTEREST."
 Father's Assignment of Error Number One "THE TRIAL COURT'S DECISION DENYING FATHER'S MOTION FOR CUSTODY AND GRANTING CSB'S MOTION FOR PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION AND WAS NOT IN THE MINOR CHILD'S BEST INTEREST."
 Father's Assignment of Error Number Two "THE TRIAL COURT'S DECISION DENYING FATHER'S MOTION FOR LEGAL CUSTODY TO PATERNAL RELATIVES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND/OR WAS CONTRARY TO LAW AND WAS NOT IN THE MINOR CHILD'S BEST INTEREST."
 Father's Assignment of Error Number Three "THE TRIAL COURT'S DECISION DENYING [FATHER'S] MOTION FOR LEGAL CUSTODY PLACEMENT WITH THE MINOR [CHILD'S] PATERNAL RELATIVES CONSTITUTED AN ABUSE OF DISCRETION AND WAS NOT IN THE MINOR CHILD'S BEST INTEREST."
 {¶ 8} Mother and Father have each claimed that the evidence failed to support the trial court's judgment granting permanent custody of S.P. to CSB. They have argued that the evidence supported, instead, a determination that it was in the best interest of the child to be placed either in the custody of one of the parents or in the legal custody of the McNarys, paternal relatives. Additional arguments raised by each parent are included in the discussion below.
 {¶ 9} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of *Page 5 
permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95,99.
 {¶ 10} The trial court found that the first prong of the permanent custody test was satisfied because S.P. had been in the temporary custody of CSB for at least 12 of the prior 22 months. Neither Mother nor Father has contested that finding. Father has challenged the trial court's alternative finding on the first prong of the best interest test, but because Father has conceded that the child had been in the temporary custody of the agency for at least 12 of the prior 22 months, his challenge of the alternative finding need not be addressed. Both Mother and Father have challenged the finding on the second prong of the permanent custody test, i.e., that it is in the best interest of the child to be placed in the permanent custody of the agency.
 {¶ 11} When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5). *Page 6 
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at *6; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24. The Supreme Court has indicated that no one factor is to be given more weight than another. In reSchaefer, 111 Ohio St.3d 498, 2006-Ohio-5513, at ¶ 56.
 {¶ 12} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). SeeIn re D.A., 113 Ohio St.3d 88, 2007-Ohio-1105, at ¶ 12. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) In re Adoption ofHolcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 13} Mother and Father have each asserted that the evidence fails to support the decision that permanent custody is in the best interest of the child. Each parent has argued that the evidence supports, instead, a finding that it would be in the best interest of the child to return to the custody of that parent or, alternatively, to be placed in the legal custody of the McNarys. The best interest factors of R.C. 2151.414(D) are not only relevant to the question of permanent custody, but also provide appropriate guidance in determining whether a grant of legal custody is in the best interest of a child. See In re T.A., 9th Dist. No. 22954, 2006-Ohio-4468, at ¶ 17. Thus, the central question before the trial court was a determination of the best interest of S.P., and that determination was directed to the statutory factors of R.C. 2151.414(D).
 {¶ 14} The first best interest factor requires a consideration of the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and *Page 7 
out-of-home providers, and any other person who may significantly affect the child. See R.C. 2151.414(D)(1). The trial court found that S.P has a significant bond with both her foster parents and her half-sibling, D.P. S.P. had lived with them for nearly two years and all but the first few weeks of her life.
 {¶ 15} The trial court did not find that the relationship of the child with either of her parents or with the McNarys was as compelling because of surrounding factors and concerns. As to Mother, the court found that the child had a bond with her, but Mother had not progressed beyond monitored visits at the visitation center. Mother has pointed to the fact that she substantially complied with her case plan. The trial court credited Mother with completing the objectives of her case plan, but found that Mother failed to incorporate those lessons into her parenting and general behavior. Evidence supporting that conclusion came from caseworker Diana Meyer, who worked with Mother on two of her CSB cases. Ms. Meyer testified that although Mother had been compliant with the case plans in both cases, she had also failed to remedy the existing concerns in both cases.
 {¶ 16} In addition, the trial court found that Mother had repeatedly failed to protect her children from abuse by the men in her life, and, furthermore, that she lacked insight into her own role in that abuse and failed to express remorse. Significantly, the trial court found that Mother had placed her need for companionship ahead of her own safety and her children's safety. She repeatedly demonstrated poor judgment as she exposed herself and her children to risk of harm from the men she brought into her life. The testimony of parenting evaluator, Dr. Anne Hickin, supported this conclusion. Dr. Hickin testified that, in addition to a bipolar disorder, Mother had narcissistic personality traits, such as arrogance, a self-centered image, lack of sympathy to the needs of others, and displays of anger when confronted. Dr. Hickin identified Mother's mood *Page 8 
swings and her inability to respond to the needs of others as risk factors. Although several of the service providers cautioned Mother about her relationship with her current fiancé, the trial court found that Mother lacked insight into understanding how her current fiancé's use of illegal drugs could impact S.P. and that Mother refused to believe her fiancé committed the offense of public indecency despite his conviction for that crime. These findings properly reflect a concern that Mother would continue to expose her children to a risk of harm.
 {¶ 17} As to Father, the trial court found that he had been very inconsistent in attending visitation. Father has claimed that there was evidence of a "strong bond and loving and caring relationship" between him and his daughter and that his interaction with her was appropriate. The trial court agreed that Father was appropriate during his visitations, but found that his visits were infrequent, inconsistent, and that there was "little evidence to show there is a significant and positive bond" between him and his child. The testimony of Caseworker Meyer supports this finding. She confirmed that Father is attentive and caring, but also stated that she could not report that Father was bonded with S.P. Caseworker Jackson, appointed in May 2007, testified that Father attended visitation only once since her appointment. Father's scheduled visits were cancelled three or four times due to his repeated failure to attend. The trial court also credited testimony from Caseworker Meyer regarding Father's lack of stability in terms of housing and employment.
 {¶ 18} The trial court found no evidence of a relationship between S.P. and any maternal relatives and no evidence of a previous relationship with the McNarys or any other paternal relatives. Father has claimed that there is a "loving and caring relationship" between S.P. and the McNarys. However, the McNarys met the child for the first time on November 6, 2007, six weeks after the first two days of the permanent custody hearing. Although the McNarys were *Page 9 
recognized by the trial court as "a fine couple" and got along well with S.P. during their limited time together, the evidence unquestionably supports the conclusion of the trial court that they had no significant relationship with the child.
 {¶ 19} The second best interest factor requires consideration of the wishes of the child as to the custodial placement. See R.C. 2151.414(D)(2). Since S.P. was too young to express her wishes, the trial court heard the recommendation of Linda Bennett, the guardian ad litem. See In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 56. Ms. Bennett did not believe that custody should be granted to either parent. She recommended that the motion for permanent custody be denied, however, and believed it was in the best interest of the child to be placed in the legal custody of the McNarys. Ms. Bennett reasoned that this arrangement would permit the child to maintain a relationship with her biological parents, her half-sibling, and her foster family.
 {¶ 20} Both Mother and Father have challenged the trial court's failure to follow the recommendation of the guardian ad litem. At the outset, it is important to recognize that the recommendation of the guardian ad litem, while important, does not control the result in this case. As stated above, no single best interest factor is to be given more weight than another in a best interest determination. In reSchaefer at ¶ 56. Nevertheless, it is helpful to review the reasoning of the trial court as expressed in its decision.
 {¶ 21} The trial court found that "[w]hile the concept of `family' based on blood ties is valid, * * * the familial connection which arises from the nurturing of a child [is] just as valid, and in this case, more important." In explaining its decision, the trial court relied, in part, on the fact that the parental relationships — the basis for any reason to uproot the child from the only home she has known — were flawed, as described more fully above. Moreover, the trial court found that although the McNarys are a fine couple, they are, in fact, "strangers to this child." There *Page 10 
were no previous bonds between them, but only, as stated by the trial judge, "a connection to be established."
 {¶ 22} The trial court found that the child's bond to Father, Mother, or their extended families did not merit disturbing the significant bond the child had with her foster parents. The court also reasoned that S.P.'s most important familial relationship is with her half-brother, and that the surest means to preserving that relationship is through an order of permanent custody.
 {¶ 23} Mother has argued that there was no evidence to support the trial court's statement that "the most important familial relationship" is the one between S.P. and her half-brother. There was testimony that S.P. had relationships to various degrees with Mother, Father, her foster parents, and her half-sibling. There was also evidence regarding the frequency of interaction between these individuals, and other evidence which helped explain the quality of those relationships and their current or potential impact on the child. There was no evidence of any bond whatsoever between S.P. and any of the maternal or paternal relatives. At the same time, the current caseworker, Angela Jackson, testified that S.P. was thriving in her foster home and was attached to her foster mother. She stated that it is a safe, stable home and S.P. is very happy and comfortable there. Ms. Jackson also testified that S.P. and her half-brother share a "very strong bond" and that it was "very important" to keep S.P. with her half-brother if it would not be possible to return her to either parent. On the basis of this evidence, the trial court was entitled to conclude that S.P.'s relationship with her half-brother was the most important of those relationships.
 {¶ 24} The third best interest factor requires consideration of the custodial history of the child, including the fact that the child had been in the temporary custody of the agency for more than 12 of the past 22 months. See R.C. 2151.414(D)(3). This two-year-old child had never *Page 11 
been in the custody of either of her parents. She had resided with the same foster family and with her half-brother for all but the first few weeks of her life.
 {¶ 25} Father has argued that the period of temporary custody should not be held against him because it was lengthened by a six-month extension, which was granted, he has claimed, because the trial court believed Father had made significant progress on his case plan. While that argument may hold true in some cases, the facts of the present case do not support such a claim. The record indicates that CSB moved for a six-month extension on October 6, 2006. In its motion, the agency cited Father's historical problems with housing, but indicated that he had reunited with his wife and that that home was appropriate. The agency noted that Father had completed a mental health assessment and some counseling. The agency also relied upon the fact that Father had a bond with the child and Father's wife was to begin visiting with the child as well.
 {¶ 26} The motion was considered at a hearing in November 2007. The trial court granted the extension, but in so doing, it indicated that Father had recently been taken off of the visitation schedule for missing three visits in a row with S.P. The trial court also found that it was unclear where Father was living and that his wife had not attended any visits with the child, as expected. The trial court noted that there was confusion between the adults about the roles they intended to play in the child's life. Mother had anticipated that she and Father would co-parent the child, and was not aware of any intended involvement by Father's current wife. There was no claim by the agency and certainly no specific finding by the trial court of "significant progress" by Father on his case plan. Indeed, Father's housing problems continued, his wife had failed to attend any visitations, and there was confusion among the adults as to their parenting *Page 12 
roles in regard to S.P.'s care. Upon this record, this Court cannot say that the custodial history should not be held against the parents.
 {¶ 27} Fourth, the trial court considered the child's need for a "legally secure permanent placement" and whether one could be achieved without a grant of permanent custody to CSB. See R.C. 2151.414(D)(4). Both CSB caseworkers took the stand before the McNarys became involved and recommended that permanent custody be granted to CSB. CSB supervisor, Sheri Snyder, testified after the McNarys initiated their efforts to obtain legal custody, but also testified in support of permanent custody with a goal of adoption because it would permit S.P. to remain in the only home she has ever known and it would not be in the child's best interest to move her. Ms. Snyder cited the kinship report which recommended against placing S.P. with the McNarys because of the disruption S.P. would suffer and because, after two years of foster care, there was no time to make a smooth transition. The evidence established that S.P. appears to be well-adjusted, happy, and thriving in her foster placement.
 {¶ 28} As to this factor, Father has claimed that he complied with his case plan objectives and was, therefore, capable of providing a legally secure environment and caring for his daughter on a permanent basis. He has argued that CSB failed to produce any credible evidence that he lacked appropriate parenting abilities and could not provide for his daughter's basic needs, and that the trial court failed to adequately consider evidence of his case plan compliance and its significance in support of his request for custody of his daughter. He has, therefore, maintained that the trial court should have granted him legal custody.
 {¶ 29} Father faced a difficult situation, yet that situation was of his own making. Father's positive efforts to improve himself and his attempted reconciliation are creditable. However, the trial court's findings that Father was very inconsistent in his visitation and that *Page 13 
there was no significant and positive bond between him and his child are critical. Relevant to these conclusions is the trial court's additional finding that Father made no attempt to involve his extended family in S.P.'s life until the motion for permanent custody was actually being heard. The trial court specifically found Father's claim that he was not aware that he could seek a relative placement until Ms. Bennett spoke to him to be incredible. The court found that it was more credible to believe Father chose not to "burden" his relatives and chose not to seek family involvement until very late in the proceedings. In doing so, he essentially made a choice that does not support a custodial award.
 {¶ 30} Mother has argued that an order of legal custody to the McNarys would provide a legally secure placement, and has pointed out that the trial court agreed with such a statement. While finding that an award of legal custody to the McNarys would be "legally secure," the trial court also found that such a placement would delay, rather than promote permanency. The trial court found, therefore, that an order of legal custody to the McNarys would not be in the best interest of the child.
 {¶ 31} In reaching this conclusion, the trial court emphasized the fact that S.P. had been in temporary custody for more than two years, as long as the law permits, and had never met the McNarys until November 2007. As stated by the trial judge, "they are strangers to this child." The trial judge solicited opinion from the parties as to possible transition plans and he considered the impact of such plans on the best interest of the child. The guardian ad litem, who advocated placement with McNarys, acknowledged that any plan of transition must be carefully devised, but she had no suggestions on how a transition might be accomplished. Mother's counsel suggested that the trial court grant legal custody to McNarys, who would then arrange a voluntary surrender back to CSB, allowing the child to remain in her current home until she *Page 14 
becomes comfortable with the McNarys. The trial judge rejected such a plan and concluded: "The purpose of permanency planning is to eliminate prolonged foster care. An order of legal custody would delay rather than promote permanency." The trial court reasonably concluded, therefore, that the fourth factor weighed in favor of an order of permanent custody to the agency.
 {¶ 32} None of the factors in R.C. 2151.414(D)(5) are relevant.
 {¶ 33} Finally, Father and Mother have argued that the trial court abused its discretion in denying the motion for legal custody to the McNarys. The trial court did not abuse its discretion when it denied a motion for legal custody to a relative where the child had been in temporary custody for two years and the parent notified the trial court of a potential relative placement only after the permanent custody hearing had already begun. See In re Mills (Sept. 10, 1997), 9th Dist. No. 18047, at *4 (no abuse of discretion in an order of permanent custody where there are only last minute efforts to comply with a case plan), citing In re Swisher (Apr. 2, 1997), 9th Dist. No. 17879.
 {¶ 34} Upon review, this Court finds that the record demonstrates that there was clear and convincing evidence before the trial court from which it could conclude that permanent custody was in the child's best interests. Furthermore, the trial court did not abuse its discretion or otherwise err in denying the motions for legal custody to either parent or to the paternal relatives. Consequently, this Court does not find that the trial court erred in denying the motions for legal custody, in terminating the parents' parental rights, or in placing S.P. in the permanent custody of the agency. Mother's and Father's assignments of error are overruled. *Page 15 
 III {¶ 35} Mother's two assignments of error are overruled. Father's three assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
 Slaby, J. and Moore, P. J., concur. *Page 1